[Crim. No. 22646. Aug. 25, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN G. BROWN, Defendant and Appellant.

**COUNSEL**

J. Courtney Shevelson, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jay M. Bloom, John W. Carney and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**LUCAS, C. J.**—This is an automatic appeal from a judgment of death under the 1978 death penalty legislation. (Pen. Code, §§ 190-190.5.)[1] We affirm.

## I. FACTS AND PROCEDURE

In June 1980 defendant was a wanted man; he had failed to appear for a jury trial and another criminal hearing, and two bench warrants were issued for his arrest. After telling his former live-in girlfriend he was not going back to jail and did not want to die in prison, defendant bought a gun and changed his name to Gordon Mink.

Meanwhile the Garden Grove police were looking for him. At an evening prepatrol briefing on Saturday, June 7, the police department distributed a flier to all officers. The flier contained defendant's name, photograph, and description; it noted there were outstanding warrants for his arrest, described his car, and listed the address where the car was last seen.

Shortly thereafter, Officer McInerny and his partner, Reserve Officer Henninger, found the described car at an apartment complex. They watched it from their marked patrol car for about 45 minutes before they left to handle other pressing calls. While investigating another incident about 11 o'clock later that night, the two officers again noticed defendant's car—this time at the Cripple Creek Bar.

They called for assistance, and Garden Grove Officers Reed and Overly quickly arrived. After discussing the flier distributed earlier that evening, all four officers—all in full uniform—entered the crowded bar through two separate doors and worked their way to the center of the room.

Defendant, who was sitting in the corner with a group of other "motorcycle-type people," saw the officers enter; a nearby patron heard him say "the pigs are here," as he started for the door. The officers recognized defendant and moved in his direction. At the door, Officer Reed caught up with defendant and put his hand on defendant's shoulder. Before any of the officers could draw his weapon, defendant pulled a gun and fired at least eight times. Two lethal shots hit Officer Reed; three shots gravely wounded Officer Overly; Officer Henninger was seriously wounded; a private citizen, Terezia, suffered permanent and grave injury after being shot between the eyes; and another citizen, McKinney, was shot in the leg.

---

[1] All statutory references are to this code.

Defendant fled and hid in some bushes outside the bar. About two hours later, with numerous officers at the scene, he was found crouched in the dirt. As he was brought out of the bushes an officer called out, "Where's the gun?" Defendant stated, "I threw it." His gun, hat and keys were thereafter found nearby.

Defendant was charged with, inter alia, murdering Officer Reed (§ 187) with special circumstances, i.e., intentionally killing a peace officer while engaged in the performance of his duties (§ 190.2, subd. (a)(7)).[2]

At trial the People's case disclosed the above events. Additionally, experts testified defendant's fingerprints were found on internal parts of the recovered weapon that could be reached only by disassembling the handle of the gun, and that the weapon found was probably the murder weapon.

Defendant testified in his defense and presented expert witnesses who suggested he may have suffered from diminished capacity because of drug abuse at the time of the incident. Defendant admitted he had suffered a 1970 felony conviction in Florida for "burglary." He detailed his extensive drug abuse history and claimed to have been under the influence of methamphetamines on the night in question and that he remembered nothing of the events in question. In rebuttal, the People established that defendant's blood sample, taken shortly after his arrest, showed no presence of drugs and specifically, the test for methamphetamine was negative. Moreover, numerous officers who dealt with defendant in the four to five hours after his arrest testified that although he "stank like a pig" he behaved normally and did not appear to be under the influence of any drug.

The jury found defendant guilty of murdering Officer Reed and found the special circumstances allegation true.[3]

At the penalty trial the People showed that in 1969, defendant tried to run down a police officer in Florida and was convicted of "aggravated

---

[2] In the remaining counts, defendant was charged with (ii) assault with intent to commit murder (§ 217) and (iii) assault with a deadly weapon on a peace officer (§ 245, subd. (b)). (As to these counts it was further alleged defendant intentionally caused great bodily injury to the victim (§ 12022.7).) Defendant was further charged with (iv) a second count of assault with intent to commit murder and (v) assault with a deadly weapon on a peace officer. (As to count (v), it was again alleged defendant intentionally caused great bodily injury.) Finally, defendant was charged in two additional counts (vi & vii) of assault with intent to commit murder. (As to each of these counts, it was again alleged defendant intentionally inflicted great bodily injury on each of the victims.) As to each of the above seven counts, it was alleged defendant used a handgun within the meaning of section 12022.5.

[3] As to the final two counts (*ante*, fn. 2) the jury found defendant guilty of the lesser included offenses of assault. On all remaining counts defendant was found guilty as charged, and the weapon use and great bodily injury allegations were found true.

battery"; that he brutally blindsided a bar patron during a fight in 1978; that he and two others forced a jail inmate to orally copulate them while in jail in late 1980; that he stole wirecutters from another jail inmate and threatened "if you tell anyone you will get what I gave to that cop"; that he led a food riot at the county jail; and that he made sexual advances toward another prisoner whom he threatened to sodomize. Defendant vigorously cross-examined the prosecution witnesses who related the above testimony, but put on no evidence of his own.

The jury returned a verdict of death. The trial court heard and denied defendant's motions to modify the verdict and for a new trial, and sentenced him to death.[4]

## II. GUILT PHASE ISSUES

### A. *Representative Cross-section Jury*

Defendant claims exclusion of some potential jurors for cause in accord with *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] resulted in a jury that did not represent a fair cross-section of the community or, alternatively, excusal of "*Witherspoon* excludables" denied him a "neutral" jury on the issue of guilt. The first contention was rejected by a majority of this court in *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] (plur. opn.), 374 (Kaus, J., conc.); see also *People* v. *Balderas* (1985) 41 Cal.3d 144, 191 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d 1127]; *Lockhart* v. *McCree* (1986) 476 U.S. 162, 175-176 [90 L.Ed.2d 137, 149, 106 S.Ct. 1758, 1766]. We reject the second claim for the reasons stated in *People* v. *Anderson* (1985) 38 Cal.3d 58, 60 [210 Cal.Rptr. 777, 694 P.2d 1149], and *McCree, supra,* 476 U.S. at pages 175-181 [90 L.Ed.2d at pp. 149-155, 106 S.Ct. at pp. 1766-1770].

### B. *Use of Mannequin to Illustrate Testimony*

■ Defendant asserts the court abused its discretion in permitting the People to use a mannequin dressed in Officer Reed's full uniform to illustrate the type and placement of wounds received by the victim in order to support their theory that defendant knew when he fired his weapon that Reed was a peace officer. The record shows the court carefully considered and rejected defendant's claim that use of the dressed mannequin was unreasonably prejudicial, noting that the holes with two blood stains on the

---

[4]For the remaining convictions (*ante,* fn. 3) defendant was sentenced to prison for 10 years and 4 months.

shirt were scarcely visible, and because the dressed mannequin showed how Reed looked when he was shot, it was relevant to the charged special circumstance. We conclude use of the mannequin was "a perfectly proper method of introducing highly relevant evidence" (*People* v. *Robillard* (1960) 55 Cal.2d 88, 99 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]) and that the court's ruling was within its discretion. (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Stone* (1983) 139 Cal.App.3d 216, 224, fn. 2 [188 Cal.Rptr. 493].)

## III. SPECIAL CIRCUMSTANCE ISSUES

Section 190.2, factor (a)(7), defines as a special circumstance for which a defendant may be subjected to the death penalty, the intentional killing of a peace officer[5] while the officer was performing his duties and when the defendant "knew or should have known" that such victim was a peace officer engaged in the performance of his duties. The court instructed the jury on this special circumstance pursuant to CALJIC No. 8.81.7: "To find that the special circumstance, referred to in these instructions as murder of a peace officer, is true, each of the following facts must be proved: (1) That the person murdered was a peace officer, and (2) That he was intentionally killed while engaged in the performance of his duties, and (3) That the defendant knew or reasonably should have known that the person killed was a peace officer engaged in the performance of his duties. [¶] *For the purposes of these instructions, a Garden Grove Regular Police Officer and a Garden Grove Reserve Police Officer are peace officers.*" (Italics added.)

### A. *Instructional Error*

■ Defendant first argues the court improperly removed an element of the special circumstance from the jury's consideration, and hence denied him due process, by instructing pursuant to the italicized language. We disagree. As instructed, the jury was left to determine all elements of the special circumstance: It had to determine (i) if the victim was a peace officer, (ii) if he was intentionally killed in the performance of his duties, and (iii) if defendant knew or reasonably should have known the victim was a peace officer engaged in the performance of his duties. The challenged final sentence took no element from the jury; it merely instructed the jury on a point of statutory law—a point not open to dispute—that a Garden Grove police officer is a peace officer. (§ 7, subd. 8 ["The words 'peace officer' [throughout the Penal Code] signify any one of the officers mentioned in . . . Section 830 (et seq.)"]; § 830.1, subd. (a) ["Any . . . police

---

[5] The statute defines as a "peace officer," persons so defined in section 830.1, which provides "any police officer of a city . . . is a peace officer." (§ 830.1, subd. (a).)

officer of a city . . . is a peace officer"].) The jury was left to make all essential factual determinations, including whether the victim was a Garden Grove police officer.[6]

### B. *Constitutionality of Section 190.2, Subdivision (a)(7)*

■ Defendant next asserts he may not constitutionally be found eligible for the death penalty merely because he "reasonably should have known" (§ 190.2, subd. (a)(7)) the victim was a peace officer engaged in the performance of his duties. Instead, he argues, only those who *actually know* the victim is a peace officer engaged in the performance of his duties may constitutionally be found eligible for the death penalty. Alternatively, he argues the statute is unconstitutionally vague and overbroad.

We addressed and rejected identical claims in *People v. Rodriguez* (1986) 42 Cal.3d 730, 780-783 [230 Cal.Rptr. 667, 726 P.2d 113]. As explained in *Rodriguez,* the statute measurably advances both retribution and deterrence goals, and hence satisfies constitutional demands.[7] Additionally, the "rea-

---

[6] *People* v. *Figueroa* (1986) 41 Cal.3d. 714 [224 Cal.Rptr. 719, 715 P.2d 680], is distinguishable. We held in *Figueroa* the court erred in instructing that particular promissory notes at issue in that case were securities as a matter of law. As noted, the court here did *not* instruct the jury that *Officer Reed* was a peace officer as a matter of law; it merely instructed pursuant to the unquestionable and clear terms of the relevant statutes that Garden Grove police officers are peace officers.

[7] Although we recognized in *Rodriguez* the possibility that *nonself-induced* "diminished capacity" might preclude application of the special circumstance at issue here (*id.,* at p. 782, fn. 18), we reject the suggestion—made for the first time at the initial oral argument in this case—that a defendant's *self-induced* "diminished capacity" might produce the same result.

Initially, we note that in the related context of section 245, subdivision (b) (assault on one whom the defendant "reasonably should know" is a peace officer engaged in the performance of his duties), it has been implicitly held that due process principles are not violated by such a conviction even if the defendant was *voluntarily* intoxicated. (*People* v. *Whalen* (1973) 33 Cal.App.3d 710, 717-718 [109 Cal.Rptr. 282]; *People* v. *Finney* (1980) 110 Cal.App.3d 705, 712-714 [168 Cal.Rptr. 80].) *Finney, supra,* noted: "As a matter of public policy, defendant's voluntarily becoming intoxicated to the extent of his being unable to perceive the identities of uniformed peace officers driving marked patrol cars with lights and sirens operating is sufficiently culpable conduct to warrant criminal liability for the crime of assault with a deadly weapon on a police officer." (110 Cal.App.3d at p. 714; see also Model Pen. Code, § 2.08, subds. (2), (4) & (5); La Fave & Scott, Criminal Law (1972) § 45, at p. 346; 2 Wharton's Criminal Law (14th ed. 1979) § 108, at p. 64 ["the supportive theory [for imposing liability on those whose voluntary intoxication was 'so extreme as to prevent defendant from perceiving the pertinent risk'] is that there is enough 'negligence' involved in voluntarily becoming grossly intoxicated—thereby precluding the perception of risks—to warrant criminal liability."].)

Similarly, we hold the Eighth Amendment is not violated by an affirmative finding on the special circumstance at issue here, even if the defendant suffered *self-induced* "diminished capacity." Although advancement of the *deterrent* goal might be questionable with respect to a defendant who—by reason of self-induced diminished capacity—has "reduced capacity for considered choice" (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 13 [90 L.Ed.2d 1, 12, 106

sonably should have known" standard is one that jurors should be able to comprehend without amplification.

## IV. Penalty Phase Issues

### A. *Admission of Foreign Felony Convictions*

■ Defendant contends that because he offered to stipulate to his conviction for the 1969 Florida aggravated battery on a police officer (Officer Paulk), the People should have been precluded from allowing the officer to testify about the circumstances of that event under section 190.3, factor (c). Our review of the record discloses the evidence was argued under factor (b), not factor (c). As we recently held in *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301], the People may properly present evidence showing the circumstances of the prior violent criminal activity.

Defendant next urges that evidence of the Florida aggravated battery should not have been allowed because the minimum elements of the foreign felony conviction would not have proved a California felony at the time the felony was committed. He argues that admitting the evidence of the crime at the penalty phase raised "serious problems akin to double jeopardy and denial of speedy trial," by allowing the People to "relitigate the circumstances of the offense to prove some fact which was not an element of the crime." His argument, however, is misplaced. As noted above, the Florida aggravated battery evidence was argued to the jury under section 190.3, factor (b) ("prior criminal activity by the defendant"), *not* factor (c) ("prior felony conviction" of defendant). We conclude the evidence was properly considered under factor (b). (*People* v. *Melton* (1988) 44 Cal.3d 713, 757, fn. 18 [244 Cal.Rptr. 867, 750 P.2d 741].)

Defendant finally notes the jury was instructed to consider, in its sentencing determination, "all of the evidence which has been received during any part of the trial of this case." He argues that this instruction permitted the jury to consider his Florida burglary conviction—which he had admitted solely for purposes of impeachment at the guilt phase. He asserts this would

S.Ct. 1669, 1675] (Powell, J., conc.); see also *People* v. *Hood* (1969) 1 Cal.3d 444, 458 [82 Cal.Rptr. 618, 462 P.2d 370]; cf., *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 115, fn. 11 [71 L.Ed.2d 1, 11, 102 S.Ct. 869]), at least the *retributive* goal would still be measurably advanced in such cases: The moral opprobrium that attaches to the intentional killing of one whom the defendant should have known was a peace officer performing his duties is not diminished, and society's need for retribution is no less, merely if the reason for the defendant's negligence as to the status of his intentionally killed victim is defendant's self-induced "diminished capacity."

constitute error because the foreign felony conviction was inadmissible under section 190.3 factor (c), since the minimum elements of the crime would not have proved a California felony at the time the crime was committed.

Our review of the record, however, does not support defendant's claim that the foregoing "catchall" instruction would mislead a reasonable jury on this point. First, the burglary conviction was never mentioned during the penalty phase. Most significantly, defendant neglects to note that the jury was also instructed (at the guilt phase) to consider the burglary evidence for the limited purpose of impeachment. On this record, we have no reason to suspect the jury would not continue to view the burglary evidence as so limited.

B. *Failure to Instruct That Evidence of Other Violent Criminal Acts Must Be Proved Beyond a Reasonable Doubt*

In a related argument, defendant contends the court erred in failing to instruct the jury sua sponte that evidence of defendant's prior violent criminal acts (*ante,* pp. 441-442) could be considered in aggravation only if proved beyond a reasonable doubt. (*People* v. *Robertson* (1983) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279] (plur. opn. by Kaus, J.), pp. 60-63 (conc. opn. by Broussard, J.).) As we recently explained in *People* v. *Miranda, supra,* 44 Cal.3d 57, we have long held that such an instruction is required at the penalty phase. (*Id.,* at p. 97, and cases cited.) The Attorney General concedes the error, but argues it did not affect the verdict because each of the violent criminal acts was "unmistakably" proved beyond a reasonable doubt.

Before we analyze the effect of the error on the penalty verdict, we note an absence of authority indicating that the failure to give the *Robertson* "reasonable doubt" instruction, as a condition to the jury's consideration of other-crimes evidence as aggravating circumstances, amounts to federal constitutional error. (See *Miranda, supra,* 44 Cal.3d at p. 98 [the *Robertson* "rule is an evidentiary one and not constitutionally mandated"].) We therefore apply our own state law harmless-error standard. (See *Barclay* v. *Florida* (1983) 463 U.S. 939, 940, 958 [77 L.Ed.2d 1134, 1138, 1149, 103 S.Ct. 3418]; *Zant* v. *Stephens* (1982) 462 U.S. 862, 888-891 [77 L.Ed.2d 235, 256-259, 103 S.Ct. 2733].)

It is undisputed that, when reviewing state-law errors occurring at the guilt phase of a trial, the standard of review is that announced in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], i.e., whether it is "reasonably probable" a result more favorable to the defendant would have

been reached had the error not occurred. For over two decades, however, we have recognized a fundamental difference between review of a jury's objective guilt phase verdict, and its normative, discretionary penalty phase determination. Accordingly, we have long applied a more exacting standard of review when we assess the prejudicial effect of state-law errors at the penalty phase of a capital trial. (See *People* v. *Hamilton* (1963) 60 Cal.2d 105, 136-137 [32 Cal.Rptr. 4, 383 P.2d 412]; *People* v. *Hines* (1964) 61 Cal.2d 164, 169 [37 Cal.Rptr. 622, 390 P.2d 398].)

In 1982 Justice Broussard, concurring in *People* v. *Robertson, supra,* 33 Cal.3d 21, at page 63, reviewed *Hamilton* and *Hines,* and rearticulated the appropriate standard as calling for a determination of whether there is a "reasonable possibility" such an error affected a verdict. A number of subsequent opinions have embraced that standard. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1281 [232 Cal.Rptr. 849, 729 P.2d 115] (plur. opn.); *People* v. *Davenport* (1985) 41 Cal.3d 247, 280 [221 Cal.Rptr. 794, 710 P.2d 861] (plur. opn.) & 295 (Broussard, J., conc.); *People* v. *Phillips* (1985) 41 Cal.3d 29, 83 [222 Cal.Rptr. 127, 711 P.2d 423] (plur. opn.), 84 (Kaus, J., conc.) & 85-89 (Bird, C. J., conc. & dis.).)

In this and numerous other capital cases, the Attorney General asks us to retreat from the reasonable-possibility standard and adopt the *Watson* standard for all nonfederal penalty phase error. He asserts that because our "modern" death penalty statutes (i.e., the 1977 and 1978 laws), unlike the earlier statutes, contain various guidelines to channel a jury's sentencing discretion, we no longer need apply at the penalty phase a standard of review more exacting than *Watson*'s reasonable-probability test. Further, the Attorney General notes that our state Constitution permits reversal of a judgment only on a showing that the error resulted in a "miscarriage of justice" (art. VI, § 13), and he suggests *Watson* is the definitive articulation of that constitutional phrase for all types of error, whether at the guilt or penalty phase.

We reject both points. Although it is true that today's death penalty statutes (more than the former statutes) channel and guide the capital jury's sentencing decision, we cannot ignore the United States Supreme Court's mandate that a capital jury must retain and exercise vast discretion different from that possessed by any guilt phase jury. (E.g., *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 329-330 [86 L.Ed.2d 231, 239-240, 105 S.Ct. 2633] (and cases cited), & fn. 2.)

When the "result" under review is the product of a jury's *factfinding,* the *Watson* version of the constitutional "miscarriage of justice" provision is an appropriate and workable standard of review. In such situations the review-

ing court can determine if the error likely affected the jury's factfinding and hence its guilt-innocence determination. A capital penalty jury, on the other hand, is charged with a responsibility different in kind from such guilt phase decisions: its role is not merely to find facts, but also—and most important—to render an individualized, *normative* determination about the penalty appropriate for the particular defendant—i.e., whether he should live or die. When the "result" under review is such a normative conclusion based on guided, individualized discretion, the *Watson* standard of review is simply insufficient to ensure "reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (plur. opn.); accord, *Satterwhite* v. *Texas* (1988) 486 U.S. 249, __ [100 L.Ed.2d 284, 292-295, 108 S.Ct. 1792, 1796-1798]; *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, 329-330 [86 L.Ed.2d 231, 239-240]; *Zant* v. *Stephens, supra,* 462 U.S. 862, 884-885 [77 L.Ed.2d 235, 254-255].)

We will therefore abide by the reasonable-possibility test as our articulation of the constitutional "miscarriage of justice" standard when assessing the effect of state-law error at the penalty phase of a capital trial. In deciding whether it is "reasonably possible" that a given error or combination of errors affected a verdict, we will "exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker . . . . The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 695 [80 L.Ed.2d 674, 698, 104 S.Ct. 2052] [discussing "prejudice" component of ineffective counsel claim arising from guilt and penalty phases of trial].) We therefore emphasize that a "mere" or "technical" possibility that an error might have affected a verdict will not trigger reversal. Instead, when faced with penalty phase error not amounting to a federal constitutional violation, we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred.

■ The People argue the *Robertson* error (*ante,* at p. 446) would not possibly have affected a reasonable jury's verdict because each of the violent criminal acts was "unmistakably" proved beyond a reasonable doubt. We agree. Our review of the record reveals that many, if not all, of the incidents were supported by overwhelming evidence of defendant's use of, or threat to use, violence. Indeed, the evidence of prior violent activity offered as an aggravating circumstance was proved so overwhelmingly by direct testimony that defense counsel did not refute it at final argument. Accordingly, we perceive no reasonable possibility that reasonable jurors would have ren-

dered a different verdict had the instructional error discussed above not occurred.

## C. *Evidence of Other Criminal Conduct*

██ Defendant contends the court erred in admitting aggravating penalty evidence, that was (i) not criminal or (ii) criminal but did not involve the use or threat of force or violence. (§ 190.3, factor (b).) He claims neither the "food riot" incident, the threats of sexual conduct with a jail inmate nor the possession in jail of the stolen wirecutters constitutes criminal conduct, and that reversal is required under *People* v. *Boyd* (1985) 38 Cal.3d 762, 774-775 [215 Cal.Rptr. 1, 700 P.2d 782]. The People assert all three incidents involved criminal conduct and at least the threat of violence.[8]

In *Boyd, supra,* 38 Cal.3d 762, we considered the permissible scope of evidence the prosecutor may introduce pursuant to factors (a) through (k) of section 190.3. We held the jury may consider as evidence in aggravation only that which specifically bears on the factors enumerated in factors (a) through (k), and the prosecutor may not offer additional evidence beyond that delineated in the statutory guidelines. (*Id.,* at p. 773.)

The evidence presented here regarding the food riot, wirecutter incident and sexual misconduct in jail, may have been properly introduced pursuant to section 190.3, factor (b). Assuming arguendo that any of the evidence was improperly admitted, our review of the record does not demonstrate prejudice. As with the *Robertson* error discussed above, we are aware of no authority indicating that such assumed error amounts to a federal constitutional violation; accordingly, we apply our state-law penalty phase harmless-error test. We note that the properly admitted aggravating evidence in this case—specifically, the circumstances of the crime (§ 190.3, factor (a))—was simply overwhelming. On this record we conclude it is not reasonably possible that a reasonable jury would have rendered a different verdict had the challenged evidence not been admitted.

## D. *Former CALJIC Nos. 8.84.1 and 8.84.2*

 Defendant observes: (i) the jury was instructed pursuant to the complete version of former CALJIC No. 8.84.1 on the factors it was to consider in determining defendant's penalty and it was not given the "expanded factor (k)" instruction subsequently prescribed in *People* v. *Easley*

---

[8] In a related argument, defendant complains that evidence elicited at the guilt phase about his drug and gun possession was erroneously considered by the penalty jury as an aggravating factor. The People correctly assert, however, that the prosecutor made no mention of such facts in his penalty arguments.

(1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], nor was it otherwise instructed that it might consider "sympathy" factors favoring defendant; and (ii) the jury was instructed pursuant to former CALJIC No. 8.84.2, that it was to impose a sentence of death if it found aggravating circumstances outweighed mitigating circumstances, and it was not given further instructional clarification as to the scope of its discretion pursuant to *People v. Brown* (1985) 40 Cal.3d 512, 544 [220 Cal.Rptr. 637, 709 P.2d 440], footnote 17, reversed on another ground *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].

We noted in *People* v. *Easley, supra,* 34 Cal.3d 858, that section 190.3, factor (k) (which is reproduced in former CALJIC No. 8.84.1) speaks only of a "circumstance which extenuates the gravity of the crime." In order to better serve constitutional concerns we imposed the prospective requirement that "trial courts—in instructing on the factor embodied in section 190.3, [factor] (k)—should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" (34 Cal.3d 858, 878, fn. 10.)

▮▮ Similarly, as we stated in *Allen,* "we explained in *People* v. *Brown, supra,* [40 Cal.3d 512,] that the statute's 'weighing process' described in former CALJIC No. 8.84.2, is the method by which '*the jury* . . . determines under the relevant evidence *which penalty is appropriate* in a particular case.' [Citation.] Our concern in *Brown* was that the unadorned statutory instruction might in two interrelated ways lead the jury to misapprehend its discretion and responsibility. [¶] First, we pointed out that the jury might be confused about the nature of the weighing process. As we observed: '[T]he word "weighing" is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary "scale" or the arbitrary assignment of "weights" to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the factors he is permitted to consider.' [Citation.] [¶] Second, we were concerned in *Brown* that the unadorned instruction's phrase, 'the trier of fact . . . *shall* impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances' (italics added), could mislead the jury as *to the ultimate question it was called on to answer* in determining which sentence to impose. Although the quoted phrase could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's per-

sonal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances, we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that fashion. Instead we stated: 'By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" mitigating, the statute should not be understood to require any juror to vote for the death penalty *unless,* upon completion of the weighing process, *he decides that death is the appropriate penalty under all the circumstances.* Thus *the jury, by weighing the various factors,* simply *determines under the relevant evidence which penalty is appropriate in the particular case.'* [Citation.]" (*Allen, supra,* 42 Cal.3d 1222, 1276-1277.)

██ ██ Although in *Brown* we again called for clarifying instructions in future cases, we stated we would examine each earlier case posing *Easley* and *Brown* defects "on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

Undertaking such an inquiry here, we conclude that a reasonable jury would not have been misled in either respect, and hence there was no factor (k) or *Brown* error.

1. *Factor (k)*

██ Although defendant presented no formal evidence at the penalty phase, the jury was instructed to consider all the evidence introduced at the guilt phase, and that evidence included the testimony supporting defendant's diminished capacity defense. The jury was, of course, free to consider such evidence as a mitigating factor under former CALJIC No. 8.84.1, factor (h) ("Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, or the effects of intoxication"). Additionally, the jury was free to consider the evidence of defendant's history of drug abuse, and his history generally, as a mitigating factor under factor (k).

Significantly, the prosecutor said nothing to limit the jury's consideration of mitigating evidence under factor (k). He merely argued that factor (k) "[i]s a catch-all and it is any other circumstance which . . . extenuates the gravity of the crime even though it is not a legal excuse for the crime. [¶] I can't think of anything that fits in there, anything that extenuates the

gravity of this crime. There can be nothing that extenuates the gravity of *this* crime."

In context, we believe the prosecutor's comment would reasonably be understood not as telling the jury to *ignore* any of defendant's mitigating character evidence, but rather that, in the prosecutor's view, nothing presented to the jury in mitigation outweighed the aggravating circumstances of this particular crime. (See *Allen, supra,* 42 Cal.3d at p. 1276.)

### 2. *Brown*

█ Initially, we are satisfied that the jury was not misled about the nature of the "weighing" process it was required to perform under the statutory instructions. At the beginning of his argument, the prosecutor told the jury it was required to "weigh" the factors to determine if the aggravating or the mitigating factors were "heavier," and that it was up to the jury to decide if the aggravating factors outweighed those in mitigation. These comments, we believe, would reasonably have been understood by the jury as indicating its discretion to decide for itself what "value" to attach to the various factors. It is true that the prosecutor strayed from that approach at the conclusion of his argument by telling the jury, "if you add those factors up" and the aggravating factors prevail, "that's a case where the death penalty is the only appropriate penalty." Viewed in context, however, we do not believe this isolated comment would reasonably have been interpreted as canceling the prosecutor's previous, correct description of the weighing process.

In any event, even if we were to assume the prosecutor's final comment left the jury with ambiguous directions on its weighing task, we believe any perceived ambiguity was removed by defense counsel's argument. He forcefully told the jury: "Now, maybe some of you might think that, well, 'I will go down the list and . . . just add up and say, well, we have seven aggravating and maybe three or two mitigating and say well that, that doesn't do it. I have more aggravating than mitigating,' and bring back the death penalty. [¶] Each one of those things, each one of those items are not equally weighed. You can say, well, one of the mitigating factors I can consider is [factor (h)] . . . . [¶] [Y]ou can give that a lot of weight. You are not limited to say you will give equal weight as to the other factors. . . . [¶] I don't want you to get the impression that you have to give all those factors equal weight. It is up to you how much weight you want to give. . . . [¶] I just want to make that point clear to make sure you know what you can do and what you cannot do. [¶] See, we can't restrict you as to what weight you want to give each of those items . . . . It is up to you to give what weight you want to give."

Given this detailed explanation, we are confident that a reasonable jury would have understood its discretion to assign whatever weight it deemed appropriate to the various aggravating and mitigating factors.

We turn now to the "second aspect" of our concern in *Brown,* namely, whether the jury reasonably understood its sole responsibility to decide, based on the weighing process, whether death is the "appropriate" penalty in a given case.

The prosecutor may well have given the jury conflicting signals about its role. At the close of his argument, he told the jury, "[w]as it Harry Truman that said the buck stops right here with you folks, and . . . the voters are the ones that put this law into effect and you all said you'd follow it." On the other hand, at the start of his argument he told the jury that if the aggravating factors "outweighed" or were "heavier" than the mitigating factors, "the penalty to be imposed" is the death penalty. Similarly, at the close of his argument he told the jury, "the law says . . . if the aggravating outweigh the mitigating, that's a case where the death penalty is the only appropriate penalty." We doubt, however, that these latter comments would reasonably be understood as divesting the jury of its power and responsibility to determine the "appropriateness" of defendant's sentence in the context of its weighing task. Nor do we believe that any other aspect of the prosecutor's argument, taken as a whole, conveyed a similar improper message.[9]

---

[9] At closing argument, the prosecutor, while discussing the "weighing process," returned the jury's attention to his voir dire discussion with each juror. Because the prosecutor took this approach, we have reviewed the voir dire exchanges between the prosecutor and each selected juror to determine whether the discussion at that stage might have infected the jury's understanding of its "appropriateness determination" task at penalty trial. We conclude it is not likely the jury was misled.

There is one exchange that is somewhat troublesome. As to one juror, the prosecutor stated, "if you determine that the aggravating factors are just a little bit heavier than the mitigating factors, then the law requires you to return a death penalty verdict. [¶] Do you have any quarrel with that? [¶] A: No. [¶] Q: You can follow that law? [¶] A: Yes." Later, after the prosecutor explained that the sentencing decision would be based on certain specified aggravating and mitigating factors, the following exchange occurred: "Q. And, you can look at yourself and say, 'okay,' . . . 'I feel these aggravating factors outweigh the mitigating factors, but I am still kind of on the fence about the death penalty. I am not sure about the death penalty, but in my mind I feel the aggravation outweighs the mitigation.' [¶] You will comply with the law and return a death penalty verdict? [¶] A: Yes, if that's how I feel. [¶] If I feel one outweighs the other."

The prosecutor's questions at this point did not accurately describe a juror's sentencing discretion or responsibility. (*Allen, supra,* 42 Cal.3d at p. 1277, 2d par.) But additional aspects of this juror's voir dire persuade us that the juror properly understood that she was to determine whether, in her view, death was the appropriate penalty. The trial court, in initially describing the jury's task at the penalty phase to this juror, informed her that "you will utilize what you hear in the penalty phase together with what you heard in the guilt phase in making a determination as to what the appropriate penalty would be in this particular case

Again, any doubt we might have had about whether the prosecutor's argument served to properly inform the jury about its duty to decide "appropriateness" in the context of its weighing function, is removed by examining defense counsel's arguments on this point. The thesis of counsel's presentation was that the jury had the authority and the responsibility to decide whether defendant deserved to live or die; the theme of his argument was that the jury should exercise that discretion in favor of a sentence of life in prison without the possibility of parole. He reminded the jury that each juror had promised at voir dire not "automatically" to impose the death penalty. "And, we went through the question of when you would impose the death penalty and when you would not impose the death penalty. . . . [¶] [A]ll of you stated that only in [a] certain type of a murder case [would you] impose the death penalty. . . . So I asked . . . you under what . . . conditions would you impose the death penalty. And, all of you said that it must be a crime that was so horrible." He reminded the jury that they had "agreed" that the death penalty "should be imposed" for crimes like "the Manson case," and reiterated that each juror was chosen "because I felt you were going to give this case a lot of consideration." He then stated: "Now, you have a choice," and spoke about whether death or life in prison was the "worst punishment." He again emphasized that the jury would be making a discretionary decision about appropriateness ("So you have two choices"), proceeded to argue the relative weight of the aggravating and mitigating factors as discussed above and argued against the death penalty for this defendant. In light of all this, we are confident that no reasonable jury would have been misled about its sole discretion to decide, based on its weighing exercise, whether death was the "appropriate" punishment for this defendant.

## E. *Prosecutorial Argument*

### 1. *Davenport*

■■■ The prosecutor in closing argument told the jury that the *absence* of various statutory factors tending toward mitigation should be considered

. . . ." And the following exchange between defense counsel and the juror is also instructive: "Q. [Defense counsel]: From your answers, I [take it that you] . . . do believe in the death penalty? A: When it's necessary. Q. But not in all murder cases? A: No, just when it's necessary. Q. In other words, you can examine the facts and evidence? A. Yes. Q: [If] [y]ou feel in your mind this is a type you should impose the death penalty, you'd do it? A: Right."

Viewing the record as a whole, we believe the juror understood that she would retain discretion to determine whether death was the appropriate penalty in this case. In any event, we strongly question whether any such assumed "misdirection" of a single juror during sequestered voir dire could reasonably be said to have infected the jury's penalty phase sentence selection.

as aggravating factors in the jury's weighing process.[10] Reviewing a similar argument in *Davenport, supra,* 41 Cal.3d 247, 288-289, the plurality reasoned: "the statutory instruction that the trier of fact consider the factors 'if relevant' seems to contemplate that not all factors will be relevant in all cases and further that a factor which is not relevant to the evidence in a particular case should be disregarded." (*Id.,* at p. 289.) A contrary interpretation, the plurality held, would make "[s]everal of the statutory mitigating factors . . . [that are] particularly unlikely to be present in a given case . . . aggravating circumstances automatically applicable to most murders." (*Ibid.*) The plurality concluded prosecutorial argument like that made here "is likely to confuse the jury as to the meaning of 'aggravation' and 'mitigation' under the statute and is therefore improper under section 190.3. It should not in the future be permitted." (*Id.,* at p. 290.) We have recently embraced the *Davenport* plurality's reasoning in *Rodriguez, supra,* 42 Cal.3d at pages 789-790 (see also *People* v. *Ghent* (1987) 43 Cal.3d 739, 775-776 [239 Cal.Rptr. 82, 739 P.2d 1250]).

---

[10] As to section 190.3, factor (d) ("Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"), the prosecutor told the jury: "This defendant doesn't have that excuse. He has no mental or emotional disturbance other than the fact that he just is a sociopath, an antisocial and likes to hurt people. So in this particular case that's an aggravating factor." As to factor (e) ("Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act"), he told the jury: "Obviously in this case there is no way that Don Reed participated [in] or consented to the homicidal type conduct. So in this case it is an aggravating factor." As to factor (f) ("Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct"), he stated: "Can we in the wildest stretch of our imagination believe that the defendant felt morally justified killing Don Reed? Absolutely not. It is ridiculous to even suggest this. This is an aggravating factor." As to factor (g) ("Whether or not defendant acted under extreme duress or under the substantial domination of another person"), he maintained: "Did someone force the defendant? Was the defendant under some type of forceful duress to kill Don Reed? Absolutely not. Did someone dominate the defendant and was kind of the mastermind and had the defendant kill Don Reed? Absolutely not. [¶] This is an aggravating factor." As to factor (h) ("Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication"), the prosecutor noted that the defense was based on such a contention, but argued the evidence did not establish such "diminished capacity," and stated "[s]o I'd submit to you that is an aggravating factor." As to factor (i) ("The age of the defendant at the time of the crime") the prosecutor maintained that defendant's age at the time of trial—34—"to me would be an aggravating type of factor. It's more aggravating than mitigating." Finally, as to factor (j) ("Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor") the prosecutor argued: "The sole cause of the death of Don Reed at this point is this defendant. No way is his participation minor. He wasn't an accomplice in anything. He was the original and the only actor, so that's an aggravating factor. There's no question about that." In his summation, the prosecutor told the jury that "each of those factors"—apparently, even the alleged *absence* of mitigating evidence under factor (k) ("Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime")—"is an aggravating factor . . . ."

Although the prosecutor's argument here seems contrary to *Davenport,* we do not consider the prosecutor's argument to be reversible prosecutorial misconduct, because a timely objection and admonition could have cured any harm. (*Rodriguez, supra,* 42 Cal.3d at p. 790; *Allen, supra,* 42 Cal.3d at p. 1284; *Miranda, supra,* 44 Cal.3d at p. 108 & fn. 30; *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) In any event, we cannot conclude the prosecutor's argument prejudiced the jury's sentencing decision. As with the *Robertson* and asserted *Boyd* errors discussed above, we are aware of no authority indicating that prosecutorial argument contrary to *Davenport* amounts to a federal constitutional violation. Consequently, we apply our state-law penalty phase standard of review. First, as we explain above, on this record a reasonable jury would not have been misled about the nature of its weighing process. Second, we note the jury was instructed to consider the listed factors only "if relevant"; thus, we believe a reasonable jury would have understood that it was allowed to give to those factors whatever little weight they deserved. Given this, and in view of the overwhelming nature of the properly introduced aggravating evidence, we conclude it is not reasonably possible that the prosecutor's unobjected-to mischaracterization of the aggravating circumstances would have influenced a reasonable jury's sentencing decision.

## 2. *Age as an Aggravating Factor*

During closing argument, the prosecutor told the jury that defendant's age at the time of the trial—34—showed he was "old enough to know better" and that his age was therefore, in the prosecutor's opinion, "more aggravating than mitigating." (*Ante,* fn. 9.) Defendant asserts this argument was improper, but we cannot agree.

As we recently held in *People* v. *Lucky* (1988) 45 Cal.3d 259 [247 Cal.Rptr. 1, 753 P.2d 1052], "It is true that 'mere chronological age . . . should not *of itself* be deemed an aggravating factor.' (*Rodriguez, supra,* 42 Cal.3d at p. 789, italics added and deleted; accord, *Allen, supra,* 42 Cal.3d at pp. 1283-1284 (lead opn. of Grodin, J.); *Ghent, supra,* 43 Cal.3d at pp. 775-776 [. . .].) By the same token, mere chronological age of itself should not be deemed a mitigating factor. Age alone is plainly 'a factor over which one can exercise no control' (*Rodriguez, supra,* at p. 789) and as such is not relevant to the issue of penalty. This is the core of the lesson that *Rodriguez, Allen,* and *Ghent* teach. [¶] In our view, the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*Lucky, supra,* 45 Cal.3d at

p. 302.) Under the analysis set forth above, the prosecutor's comments were proper.

F. *Failure to Edit CALJIC No. 8.84.1*

Defendant notes the court instructed the jury pursuant to the entire statutory list of aggravating and mitigating factors of former CALJIC No. 8.84.1 without deleting those factors which were assertedly inapplicable under the evidence. As we have recently made clear in *People* v. *Ghent, supra,* 43 Cal.3d 739, 776-777 (1977 law), and *People* v. *Miranda, supra,* 44 Cal.3d 57, 104-105 (1978 law), this is not error.

G. *Consideration of Factors (a), (b) and (c)*

The jury was instructed, pursuant to CALJIC No. 8.84.1 (see also § 190.3, factors (a), (b) and (c)), to consider for purposes of determining penalty, "(a) [t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . ."; "(b) [t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of threat or violence" and "(c) [t]he presence or absence of any prior felony conviction . . . ." Defendant claims that in failing to modify the above instruction the trial court impermissibly allowed the jury to "double count" the circumstances of the current crime (which included the assaults against the other police officers and two civilians at the Cripple Creek Bar) as aggravating factors under *both* factors (a) and (b).

We recently held in *People* v. *Miranda, supra,* 44 Cal.3d at pages 105-106, that section 190.3 should not be interpreted to allow the jury to consider the circumstances of the crime as two separate aggravating factors. As in *Miranda,* however, we must conclude that no reasonable jury would have been so misled here. First, we doubt a reasonable jury would understand the instructions as calling for such an interpretation. Second, the prosecutor did not even suggest the jury should consider the circumstances of the crime under factor (b). We therefore find no error.

Defendant also suggests the instructions allowed the jury to "double count" the Florida aggravated assault under *both* factors (b) and (c). As previously noted, however, the record discloses the evidence was argued only under factor (b). We therefore find no error.

H. *Extreme Mental or Emotional Disturbance as a Mitigating Factor*

Section 190.3, factor (d) requires the jury to consider "whether or not the offense was committed while defendant was under the influence of

extreme mental or emotional disturbance." The jury was so instructed here. Defendant claims the instruction unduly limited the type of mental or emotional disturbance the jury was allowed to consider in rendering its sentencing decision. We recently considered and rejected an identical argument under the 1977 death penalty law in *People v. Ghent, supra,* 43 Cal.3d 739, 776.

As the People observe, the jury was additionally instructed to consider whether or not at the time of the offense defendant's ability to appreciate the criminality of his conduct "was impaired as a result of mental disease or defect or the effects of intoxication." (§ 190.3, factor (h).) Furthermore, as we noted above, the jury was also instructed to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k).) We believe the instructions and counsel's arguments thereon (*ante,* pp. 451-452), viewed as a whole, sufficiently informed the penalty jury it could consider a mental condition of the defendant which, though not characterized as extreme, would potentially mitigate the circumstances of the offense.

In a related argument, defendant complains the instruction given pursuant to section 190.3, factor (h) failed to distinguish the "substantially reduced mental capacity" instruction offered at the guilt phase as to defendant's drug intoxication.[11] He argues the similarity between the two instructions may have misled the jury into believing its guilt verdict foreclosed consideration at the penalty phase of evidence of impaired capacity that failed to establish a defense to the charges.

Again, based on the instructions and arguments thereon, we believe the jury was adequately informed that it could consider intoxication as mitigating evidence even though it did not create a reasonable doubt as to guilt. Accordingly, we find no error.

I. *Timely Notice of Penalty Phase Evidence*

 Section 190.3 provides in part, "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as

---

[11] At the guilt phase, the court instructed pursuant to CALJIC No. 8.77 (1979 revision). The first paragraph of the instruction provides: "If you find from the evidence that at the time the alleged crime was committed, the defendant had *substantially reduced mental capacity,* whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter." (Italics added.)

determined by the court, prior to trial." Defendant argues, for the first time on appeal, that certain penalty phase evidence in aggravation was erroneously admitted because the People failed to give him timely and adequate notice of what evidence the prosecutor intended to introduce at the penalty phase. Defendant asserts the statutory notice requirement applies to the trial (not the penalty phase), which, he argues, commences with the selection of jurors.

In mid-December 1980, over three months before the guilt trial began, the People filed their notice of evidence to be introduced in aggravation. The notice listed 20 incidents that the People intended to admit as evidence in aggravation at the penalty phase. Two of the listed incidents (the aggravated battery on Officer Paulk in Florida in 1970, and the assault with a deadly weapon in California in 1978) were actually presented under section 190.3, factor (b) at the penalty phase.

In late March 1982, one day after the case was called for trial, but ten days before the jury was sworn, the People filed an amended notice of evidence to be introduced in aggravation. The People listed three items of evidence that were presented at the penalty phase: (i) circumstances involving the forcible oral copulation and assault of a fellow inmate in late 1980; (ii) evidence of defendant's involvement in a robbery (wirecutter incident) in the Orange County jail in 1981; and, (iii) evidence of defendant's participation in a food riot in the Orange County jail in 1981.

Defendant avers he was prejudiced by the admission of the last three items because he did not have a fair opportunity to investigate and plan trial strategy to meet that evidence. He further claims that rejection of the listed evidence at the penalty phase "would have dramatically altered the posture of the case" to his advantage. He does not explain, however, how the proffered evidence affected his investigation and trial strategy. Furthermore, he fails to suggest how the "posture of the case" would have been "dramatically altered" had he been given more time before trial to contemplate the kind of criminal activity the People included in their amended notice. Indeed, we note that although the amount of the postguilt aggravating evidence was expanded by the three items of evidence listed in the amended notice, the nature of the evidence remained the same. Thus, we conclude that the statutory requirement of notice within a reasonable time was met here. Defendant was given the amended notice 10 days before the actual trial began, and he neither objected to the notice nor requested a continuance to investigate the evidentiary circumstances in the trial court. In any event, any error that may have occurred could not have been prejudicial on the facts of this case.

## J. Guilt Phase Instructions Applicable to Penalty Phase

■ As defendant notes, the court failed to instruct the jury as to which guilt phase instructions applied in the penalty phase. Defendant asserts that if the jury ignored all guilt phase instructions in its penalty deliberations, it was left without instruction on how it should evaluate witness credibility, admissions by the defendant, and expert or lay opinion testimony. Conversely, he contends, if the jury assumed that all guilt phase instructions should be considered at the penalty phase, he was denied a fair penalty determination because the jury was instructed at the guilt phase not to be influenced by pity or governed by sentiment or sympathy for defendant and to disregard the consequences of its decision. (CALJIC No. 1.00.)

Assuming the first scenario, we question whether there was error. Having heard nothing to contradict the earlier instructions on evaluating witnesses' credibility, etc., we believe a reasonable jury would correctly assume those "generic" instructions continued to apply. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301].) In any event, even if error occurred, we cannot imagine this amounted to reversible prejudice in this case.

Assuming the second scenario, we again question whether error occurred. As the United States Supreme Court has recently made clear, giving the "no sympathy" instruction *at the penalty phase* is not itself error. (*California* v. *Brown, supra,* 479 U.S. 538, 542-543 (plur. opn. by Rehnquist, C. J.) & 544-546 (conc. opn. by O'Connor, J.) [93 L.Ed.2d 934, 940-943, 107 S.Ct. 837, 839-841 & 841-842].) Instead, we must review the whole record to determine "whether the jury was adequately informed of its obligation to consider all of the mitigating evidence introduced by the [defendant]." (*Id.,* at p. 546 [93 L.Ed.2d at p. 943, 107 S.Ct. at p. 842] (conc. opn. by O'Connor, J.).) Here, the "no sympathy" instruction was not given at the penalty phase. Moreover, as noted above, we conclude the jury was otherwise properly informed of its obligation to consider all of defendant's mitigating evidence (*ante,* pp. 451-452). In this situation we find no "legitimate basis" (479 U.S. at p. 546 [93 L.Ed.2d at p. 943, 107 S.Ct. at p. 842] (conc. opn. by O'Connor, J.)) for believing the jury was misled in the manner hypothesized by defendant. (See *People* v. *Miranda, supra,* 44 Cal.3d 57, 102; *Gates, supra,* 43 Cal.3d at p. 1209.)

## K. Instructions on Substitution of Alternate Juror

■ Before the penalty trial, it became necessary to substitute one juror with an alternate. Defendant argues the court failed to follow the mandate of *People* v. *Collins* (1976) 17 Cal.3d 687, 694 [131 Cal.Rptr. 782, 552 P.2d

742], because it did not instruct the jurors to "disregard the earlier deliberations as if they had not been had."

*Collins* requires the trial court to instruct the jurors to begin deliberations anew if substitution becomes necessary after the jury has begun its deliberations. (17 Cal.3d at p. 694) Here, the alternate juror joined the panel of jurors before the penalty trial began, and hence, before the penalty phase deliberations began. Under these circumstances, the *Collins* instruction was not necessary to insure the preservation of the "essential elements of trial by jury. . . ." (*Id.,* at p. 692.)

## L. *Marsden Motion*

After the jury had returned its penalty verdict, defendant filed a motion in propria persona claiming he had a conflict of interest with his court-appointed counsel and requesting substitution of another appointed counsel. He now complains the court erred in allegedly ignoring his request for substitution of counsel. Specifically, he asserts the court's failure to grant his motion violated his Sixth Amendment right to effective assistance of counsel. (*People* v. *Marsden* (1970) 2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44]; Cal. Const., art. I, § 15; U.S. Const., Amend. VI.)

We find defendant's argument devoid of merit. We note that defendant has not argued on appeal that trial counsel was incompetent. ▮ Thus, we can infer his *Marsden* motion lacked substance because ineffective assistance of counsel is the foundation which supports the *Marsden* rule. (*Marsden, supra,* at 2 Cal.3d p. 123.) In any event, after careful review of the record, we conclude defendant's motion fails to show any significant impairment of his right to counsel. (*Ibid.*)

## M. *Constitutionality of 1978 Death Penalty Law*

Defendant contends the 1978 death penalty law violates the Eighth Amendment's proscription of "arbitrary" sentencing procedures because it does not provide adequate safeguards to ensure against arbitrary death judgments. He also argues the 1978 law is unconstitutional in various other respects. Each of his federal constitutional arguments has been considered and rejected in recent opinions. (See, e.g., *Rodriguez, supra,* 42 Cal.3d 730, 777-779.)

Defendant further claims his sentence is unconstitutionally disproportionate under article I, section 17 of the California Constitution. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 449-484 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921].)

In view of the facts set out *ante,* at pages 440-441, it is impossible for defendant to show his sentence is disproportionate to his individual culpability. Nor can defendant claim his sentence otherwise violates the *Dillon/Lynch* requirements. (See *Allen, supra,* 42 Cal.3d 1222, 1285-1286.)

In a related argument, defendant contends he was denied equal protection because he did not receive "comparative sentence review" pursuant to the "disparate sentence" statute, section 1170, subdivision (f). We rejected the identical claim in *Allen, supra,* 42 Cal.3d 1222, at pages 1286-1288.

N. *Application for Modification of Death Judgment Under Section 190.4, Subdivision (e)*

In every case in which a death penalty is returned, section 190.4, subdivision (e) provides the trial court must "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reason for his findings." (§ 190.4, subd. (e).)

Defendant urges the court committed three errors in its statutory modification ruling. First, he notes the court considered the absence of mitigating factors as aggravating factors. Second, he argues the court's consideration of the Florida aggravated battery as evidence of other criminal activity in its modification ruling was improper because the Florida crime was not a felony in California at the time it was committed. Finally, he contends the court demonstrated an unconstitutionally narrow interpretation of factor (k) when it stated it did not believe defendant's past abuse of drugs "extenuated the gravity of the crime."

We earlier rejected defendant's similar assertions in our review of *the jury's* penalty determination. Although we have not yet determined the applicable prejudicial error standard for reviewing trial court error in ruling on the statutory motion for modification of sentence, the error under *Davenport, supra,* 41 Cal.3d 247, was harmless under any standard. Further, as we have explained, the court's consideration of the aggravated battery as an aggravating factor was proper under section 190.3, factor (b). Finally, even assuming the court failed to consider defendant's past drug abuse as a mitigating factor, we cannot, on the facts of this case, conclude the error prejudiced defendant.

*O. Cumulative Error*

Defendant insists that the above discussed errors (*ante,* pp. 446, 449 & 455-456), viewed cumulatively, require reversal. We conclude, however, that there is no reasonable possibility that these errors, singly or in combination, affected the jury's verdict.

## V. CONCLUSION

The judgment of guilt, the finding of a special circumstance, and the penalty judgment are affirmed.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I concur in the opinion of the court and especially in its reaffirmation of the so-called "reasonable-possibility" test as the appropriate standard of review for errors in the penalty phase of a capital case.

I write separately to explain why I feel compelled to adhere to that test.

In *People* v. *Hamilton* (1963) 60 Cal.2d 105 [32 Cal.Rptr. 4, 383 P.2d 412], this court construed the mandate of article VI, section 4½ of the state Constitution—the predecessor of current article VI, section 13—in the context of penalty phase error. In so doing, it effectively adopted what is now termed the reasonable-possibility test. The relevant discussion is as follows.

"Article VI, section 4½ of the Constitution provides that a reversal shall not follow because of error 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' In *People* v. *Watson* [(1956)] 46 Cal.2d 818, 836 [299 P.2d 243], not a death penalty case, the court after an exhaustive analysis said as to the question of guilt, ' . . . the test generally applicable may be stated as follows: That a "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' That test has many times been restated. As to the issue of guilt, that test is quite clear in its application. The appellate court is required to read the record, determine what errors were committed, and then try to tell from that record whether, had those errors not occurred 'it is reasonably probable that a result more favorable to the appealing party would have been reached.' . . .

"But in deciding the effect of the errors on the penalty phase of the trial the problem is not so simple. Here, according to the mandate of section 190.1 of the Penal Code the 'determination of the penalty of life imprisonment or death shall be in the discretion' of the jury. There are no basic guide lines to assist the jury in coming to that determination. On the trial of the guilt issue the jury is bound by rules of law laid down by the court in its instructions. But on the penalty phase of the trial there are no such guide lines. The jury does not have to find ameliorating circumstances to impose life imprisonment, nor need it find aggravation to impose the death penalty. The choice between the two rests in the absolute. discretion of the jury. Conceivably, an error that we would hold nonprejudicial on the guilt trial, if a similar error were committed on the penalty trial, could be prejudicial. Where . . . the evidence of guilt is overwhelming, even serious error cannot be said to be such as would, in reasonable probability, have altered the balance between conviction and acquittal. But in determining the issue of penalty, the jury, in deciding between life imprisonment or death, may be swayed one way or the other by any piece of evidence. If any substantial piece or part of that evidence was inadmissible, or if any misconduct or other error occurred, . . . the appellate court by no reasoning process can ascertain whether there is a 'reasonable probability' that a different result would have been reached in the absence of error. If only one of the twelve jurors was swayed by the inadmissible evidence or error, then, in the absence of that evidence or error, the death penalty would not have been imposed. What may affect one juror might not affect another. . . . This being so it necessarily follows that any substantial error occurring during the penalty phase of the trial, that results in the death penalty, since it reasonably may have swayed a juror, must be deemed to have been prejudicial." (60 Cal.2d at pp. 135-137.)

Although *Hamilton* was decided more than 20 years ago, its teaching, as I shall explain, is in accord with the principles of present-day Eighth Amendment jurisprudence and hence has lost none of its persuasive force.

I begin with what should be common ground. In the formulation of a standard of prejudice, "Necessarily the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole, are material factors . . . ." (*Kotteakos* v. *United States* (1946) 328 U.S. 750, 762 [90 L.Ed. 1557, 1565, 66 S.Ct. 1239].)

As the United States Supreme Court has repeatedly emphasized, "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because

of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (opn. of Stewart, Powell, and Stevens, JJ.); accord, *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 329 [86 L.Ed.2d 231, 239-240, 105 S.Ct. 2633]; *California* v. *Ramos* (1983) 463 U.S. 992, 998-999 & fn. 9 [77 L.Ed.2d 1171, 1178-1179, 103 S.Ct. 3446], citing cases; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954] (plur. opn. by Burger, C.J.).)

In view of the qualitative difference between life and death and the consequent need for greater reliability in the determination of penalty in a capital trial, both this court and the United States Supreme Court have imposed a complex system of safeguards, peculiar to the penalty determination, in order to heighten the reliability of the outcome and thereby minimize the risk that a person may be sentenced to death even though he ought not to be. (E.g., *McCleskey* v. *Kemp* (1987) 481 U.S. 279, 299-306 [95 L.Ed.2d 262, 283-287, 107 S.Ct. 1756, 1770-1774]; *Turner* v. *Murray* (1986) 476 U.S. 28, 33-37 [90 L.Ed.2d 27, 34-37, 106 S.Ct. 1683] (plur. opn. by White, J.); *California* v. *Ramos, supra,* 463 U.S. at pp. 998-999 & fn. 9 [77 L.Ed.2d at pp. 1178-1179], citing cases; *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]; *People* v. *Easley* (1983) 34 Cal.3d 858, 877-879 [196 Cal.Rptr. 309, 671 P.2d 813].)

For the same reason that these special safeguards are imposed in penalty determinations, I believe that the standard of prejudice for penalty phase errors should be that of the reasonable-possibility test. As the cases reveal, both this court and the United States Supreme Court have sought to prevent, to the extent humanly possible, the occurrence of error which might taint the penalty determination and thereby undermine its reliability. It would plainly frustrate this goal of heightened reliability if we were then to evaluate the prejudice of *error actually committed*—which by its nature taints the reliability of the determination in some degree—under any standard other than the strictest meaningful standard, that of the reasonable-possibility test.

In my view, the reasonable-possibility test is altogether consistent with the mandate of the state Constitution. Article VI, section 13, provides that no judgment shall be reversed in any case because of any error "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage

of justice." The provision was amended into its present form in 1914, and given its present numbering in 1966.[1]

In ascertaining the meaning of article VI, section 13, a court is guided by well-settled principles. It starts with the fundamental rule that "A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) When, however, it cannot find the meaning of the provision in its words alone, it applies the rule that the object sought to be attained and the evil sought to be avoided are of prime consideration in the task of interpretation. (See *San Francisco* v. *San Mateo* (1941) 17 Cal.2d 814, 818 [112 P.2d 595]; *In re Quinn* (1973) 35 Cal.App.3d 473, 483 [110 Cal.Rptr. 881]; cf. *Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 669 [150 Cal.Rptr. 250, 586 P.2d 564] [construction of statutes].)

The words of article VI, section 13, do not define themselves. The point was recognized in *People* v. *O'Bryan* (1913) 165 Cal. 55, 64 [130 P. 1042], the first case to construe the provision, and has never been seriously disputed.

A consideration of the purpose of article VI, section 13, however, clearly reveals its meaning. Until the adoption in 1911 of the measure's predecessor, appellate courts in this state applied the rule that "prejudice is presumed from any error of law." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 65; see generally Traynor, The Riddle of Harmless Error (1970) p. 13 [hereafter Traynor]; Saltzburg, *The Harm of Harmless Error* (1973) 59 Va.L.Rev. 988, 1002-1010 [hereafter Saltzburg].)

To be sure, as Professor Saltzburg has stated, "In one sense there is always a 'presumption' that error is harmful, since any violation of the substantive laws and procedural rules which govern the criminal justice system is likely to undercut the concepts of fairness and equality that those laws and rules are meant to preserve." (Saltzburg, *supra,* 59 Va.L.Rev. at p. 1004.) Such a "presumption" is, of course, legitimate: what makes virtually all errors "erroneous" is their potential to undermine the reliability of the outcome of the proceeding in which they occur.

The presumption-of-prejudice rule that the appellate courts of this state applied before 1911, however, did not rest on such a premise. Rather, it

---

[1] The predecessor of article VI, section 13, adopted in 1911 as article VI, section 4½, applied only to criminal cases but was otherwise substantially identical.

incorporated a virtually irrebuttable presumption and thereby led almost automatically to reversals based on what were perceived to be the most technical and trivial of errors. (Traynor, *supra,* at pp. 3-4.) For example, in the notorious case of *People* v. *Vice* (1863) 21 Cal. 344, the court reversed a conviction for robbery on the ground that the indictment was fatally defective in failing to specify that the property taken did not belong to the defendant. In the even more notorious case of *People* v. *St. Clair* (1880) 56 Cal. 406, the court reversed a conviction for larceny on the ground that the indictment misspelled the word "larceny" as "larcey" and thereby failed to describe an offense. Cases like these, both in California and the nation as a whole, scarcely went unnoticed but rather led to harsh criticism for the courts. (Traynor, *supra,* at pp. 13-14; Saltzburg, *supra,* 59 Va.L.Rev. at pp. 1002-1010.)

It was to abrogate the presumption-of-prejudice rule with its effect of almost automatic reversal that the predecessor of article VI, section 13, was adopted in 1911. "Where error is shown it is the duty of the court [under this provision] to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury. The mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted." (*People* v. *O'Bryan, supra,* 165 Cal. at p. 65; see Traynor, *supra,* at pp. 16-17; Saltzburg, *supra,* 59 Va.L.Rev. at p. 1006 & fn. 58.)

Thus, both the wording and history of article VI, section 13, require the reviewing court to undertake meaningful harmless-error analysis. But neither expressly or impliedly mandates any specific standard of prejudice for any kind of error in any kind of proceeding.

Meaningful harmless-error analysis can be, and has been, conducted by courts—including this court—using the reasonable-possibility test: that standard, of course, finds a familiar expression in the beyond-a-reasonable-doubt test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (Traynor, *supra,* at pp. 37-49; Saltzburg, *supra,* 59 Va.L.Rev. at pp. 1021-1027.)

As Professor Saltzburg has explained: "Although it has been argued that this test is tantamount to a rule of automatic reversal, it must be remembered that it is a *reasonable* possibility of prejudice that is required, not just any possibility. . . . It requires neither automatic reversal nor an abdication of judgment. Rather, by requiring the court to make a judgment as to the reasonable impact of the error, it compels the court of appeals to determine whether the criminal trial was tainted with error . . . ." (Saltzburg, *supra,* 59 Va.L.Rev. at pp. 1021-1022, fns. omitted and italics in original.)

It is true that at the time *Hamilton, supra,* 60 Cal.2d 105, was decided the jury's discretion to choose between life and death was "absolute" (*id.* at p. 136), whereas now its discretion is "guided" (*Barclay* v. *Florida* (1983) 463 U.S. 939, 950 [77 L.Ed.2d 1134, 1144, 103 S.Ct. 3418] (plur. opn. of Rehnquist, J.). But insofar as harmless-error analysis is concerned, the "guided" discretion that the jury today is constitutionally required to exercise is not significantly different from the "absolute" discretion that it formerly exercised. The Constitution, to be sure, mandates that the states "provid[e] 'specific and detailed guidance' to the sentencer" in order to "narrow [its] discretion to *impose* the death sentence . . . ." (*McCleskey* v. *Kemp, supra,* 481 U.S. at pp. 303-304 [95 L.Ed.2d at p. 286, 107 S.Ct. at pp. 1772-1773], italics in original.) But "In contrast to [such] carefully defined standards . . . , the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence. '[T]he sentencer . . . [cannot] be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " (*Id.* at p. 304 [95 L.Ed.2d at p. 286, 107 S.Ct. at p. 1773], fn. omitted and italics in original.)

Moreover, such "guidelines" as are defined cannot be deemed to appreciably limit the jury's discretion insofar as harmless-error analysis is concerned. This is so because the jurors are entitled—indeed constitutionally required—to weigh the factors established by the "guidelines" *as they see fit.* The Eighth Amendment ". . . 'requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' " (*McCleskey* v. *Kemp, supra,* 481 U.S. at p. 304 [95 L.Ed.2d at p. 286, 107 S.Ct. at p. 1772]; accord, *Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [77 L.Ed.2d 235, 251, 103 S.Ct. 2733].) It follows that the jury is "free to reject death if it decides on the basis of *any* constitutionally relevant evidence or observation that it is not the appropriate penalty." (*People* v. *Brown, supra,* 40 Cal.3d at p. 540.)

As one commentator has said: "The sentencer is free to consider any factor in mitigation, in whatever way it chooses, and to impose mercy if it so desires. But, in considering aggravating circumstances, the sentencer must look only to those that are defined by statutes." (Note, *Deadly Mistakes: Harmless Error in Capital Sentencing* (1987) 54 U.Chi.L.Rev. 740, 754 [hereafter Note, *Deadly Mistakes*].)

Accordingly, in view of the character and purpose of the sentencing "guidelines" and the nature of the penalty determination, and especially in view of the jury's absolute discretion to choose life, it is plain that a review-

ing court is today no better able to determine the basis of a jury's penalty decision or the effect of a particular error on that decision than it was in the days of *Hamilton, supra,* 60 Cal.2d 105, when the jury had absolute discretion to choose *either* life or death.

Indeed, it has been argued with considerable persuasive force that under the requirements of modern Eighth Amendment jurisprudence principled harmless-error analysis is impossible and hence that all penalty phase error must be deemed reversible per se. (Cf. *Satterwhite* v. *Texas* (1988) 486 U.S. 249, __ [100 L.Ed.2d 284, 297, 108 S.Ct. 1792, 1799] (conc. opn. of Marshall, J.) ["the unique nature of a capital sentencing determination should cause this Court to be especially hesitant ever to sanction harmless-error review of constitutional errors that taint capital sentencing proceedings"].)

In the words of one commentator: "[H]armless error doctrine requires reviewing courts, upon finding an error in the proceedings below, to determine what the sentencer would have done if there had been no error. The appellate court must decide what the result of the trial would have been if the sentencer had heard a different bundle of evidence. This process is ill-suited to capital sentencing review.

"First, where aggravating evidence has been erroneously admitted, the reviewing court must decide whether or not the sentencer would have sentenced the defendant to death without knowledge of this evidence. This assessment is, to be sure, somewhat similar to the determination of harmlessness in noncapital cases: both must look to specific statutorily defined factors. But in a capital case, the sentencer has the freedom to decide how much importance to attach to aggravating circumstances; it may decide, on the basis of its observations at trial, that the aggravating circumstances are not very serious. Thus, the statutory definitions of aggravating circumstances act as only a partial constraint on the decision of the sentencer in a capital case: the sentencer may find some aggravating circumstances and yet still choose not to impose a death sentence. In noncapital cases or in the guilt phase of a capital case, on the other hand, the tribunal's choice is constrained as soon as it finds that the statutorily defined elements of a crime are present.

"Furthermore, where mitigating evidence has been erroneously withheld, the reviewing court cannot determine what the outcome would have been if the sentencer had heard this evidence. The sentencer had discretion to impose mercy if it so chose. It is one thing to say that an appeals court working from a cold record finds it congenial to decide what a 'reasonable' juror would have done in a particular circumstance; it is quite another to say that the same court can decide what a 'merciful' juror would have done.

The decision of the sentencer—be it jury or judge—ratifies 'community values' that a distant reviewing court can neither duplicate nor, perhaps, understand. Since the sentencer must have discretion to spare a defendant from execution, and that discretion contemplates acts of mercy, it is not only anomalous, but also impossible, for reviewing courts to undertake the rational inquiry outlined by *Chapman* [v. *California* (1967) 386 U.S. 18 (17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065)].

"Finally, even if the reviewing court were able to predict the effect of the error with regard to a particular aggravating or mitigating factor, it still would not be able to carry out the harmless error test. The state (or the defendant, if the error is nonconstitutional) must show that the aggravating evidence outweighs the mitigating evidence. But it is the sentencer that decides how much weight to give to the aggravating and mitigating factors, and that decision is not amenable to appellate review. Because the sentencer may—indeed, must—consider all factors in whatever balance it chooses in deciding upon the sentence, the appellate court cannot determine either beyond a reasonable doubt *or* with a reasonable certainty what impact the aggravating or mitigating factor would have had on the decision.

"Thus, the sentencer's discretion and its ability to impose mercy make it impossible for a reviewing court to weed out 'harmless' error in capital sentencing proceedings. The reviewing court is simply unable to assess the impact of any error on the sentencer—both because of uncertainty over the error's place in the sentencer's deliberations and because of the sentencer's ability to impose life imprisonment instead of death whenever it chooses. When there is error, therefore, death sentences must be reversed. The premise of the harmless error doctrine is that the impact of errors on trial and sentencing courts can be assessed by appellate courts. Where this assessment is impossible, the doctrine should not apply." (Note, *Deadly Mistakes, supra,* 54 U.Chi.L.Rev. at pp. 754-756, fns. omitted and italics in original.)

While the foregoing argument has considerable persuasive force, the undeniable fact is that it has not won acceptance. Hence, modern Eighth Amendment jurisprudence cannot be held to preclude harmless-error analysis. (See *Satterwhite* v. *Texas, supra,* 486 U.S. at p. __ [100 L.Ed.2d at pp. 293-294, 108 S.Ct. at pp. 1797-1798].) But as I have explained, the principles of that jurisprudence counsel use of the standard for the review of penalty phase error that we adhere to today—the reasonable-possibility test. Anything less would force a reviewing court to run a constitutionally unacceptable risk of affirming a judgment against a human being for whom death may not be the appropriate penalty.

For the foregoing reasons, I concur in the opinion of the court, which reaffirms the reasonable-possibility test.

KAUFMAN, J.—I concur fully in the majority opinion and judgment and write separately only to record an observation about the portion of the concurring and dissenting opinion of Justice Broussard which objects to the majority's use of the concepts of "reasonable jurors" and "a reasonable jury" in applying the "reasonable, i.e. realistic, possibility" standard of prejudice.

It is quite correct that the question to be determined in assessing prejudice is whether "this jury" may have been misled and that in doing so any indications in the record that "this jury" was actually misled may not be ignored. However, in determining the question of prejudice an appellate court must assume the jury was composed of reasonable persons and that they would react to the evidence and interpret the instructions in a reasonable way. The reason is obvious: otherwise an appellate court could not assess prejudice, for it would have no way of knowing in what idiosyncratic way an unreasonable juror might have been affected by the error or would have interpreted the instruction in question.

Thus, the majority is completely correct in utilizing the concepts of "a reasonable jury" and "reasonable jurors" in applying the unanimously adopted prejudice standard. (See, e.g., *Mills* v. *Maryland* (1988) 486 U.S. __, __ [100 L.Ed.2d 384, 394-395, 108 S.Ct. 1860, 1866]; accord, *California* v. *Brown* (1987) 479 U.S. 538, 541 [93 L.Ed.2d 934, 940, 107 S.Ct. 837, 839]; see also *People* v. *Kimble* (1988) 44 Cal.3d 480, 505, 509, 510 [244 Cal.Rptr. 148, 749 P.2d 803].)

Panelli, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting.—

I.

I concur in the affirmance of the conviction and in the majority's discussion of the special circumstance. I join wholeheartedly in the majority's conclusion that a penalty judgment must be reversed if there is a reasonable possibility that, absent error, the jury would have rendered a different verdict.[1] But I am concerned about the majority's use, in applying that standard, of the concepts of "a reasonable jury's verdict" and "reasonable

---

[1] A different verdict, under our test of error, does not necessarily mean a verdict of life imprisonment without possibility of parole. A hung jury is a more favorable verdict, since it not only avoids the death penalty but also, upon a second occurrence, gives the trial judge discretion to deny a retrial and impose a penalty of life without possibility of parole. (Pen. Code, § 190.4, subd. (d).) Thus we need only inquire whether it is reasonably possible that a single juror might have changed his or her vote in the absence of error.

jurors." (*Ante,* p. 448.) The question before us in each case is the impact of the error *on the jury that tried the case.*[2] If we have no other information about the jury's reasoning we may have to conjecture how a "reasonable jury" would proceed. But if, as is often the case, we have some reason to know how *this jury* is proceeding, we could not disregard that knowledge merely because a "reasonable jury" would approach the case differently. If, for example, a question from the jury revealed that the jurors were particularly interested in certain inadmissible evidence or in a particular erroneous argument, we could not uphold a verdict on the theory that a reasonable jury would ignore that evidence or disregard that argument.

## II.

I respectfully dissent from the majority's affirmation of the penalty judgment. There were simply too many errors at the penalty trial for me to conclude that there is no reasonable possibility that, absent those errors, the jury would have returned a verdict more favorable to defendant.

1. The trial court erred under *People* v. *Robertson* (1983) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279], in failing to instruct the jury that it could not consider past criminal activity as an aggravating factor unless it found beyond a reasonable doubt that defendant committed the crimes in question. The majority acknowledge this error. (*Ante,* p. 446.)

2. The trial court erred twice under *People* v. *Boyd* (1985) 38 Cal. 3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782], by admitting evidence of noncriminal conduct.

(a) The court admitted evidence that defendant threatened to sodomize another prisoner. The admissibility of such evidence under Penal Code section 190.3, factor (c), depends upon proof that defendant committed a criminal act involving personal violence or the threat of such violence. (See *People* v. *Boyd, supra,* 38 Cal.3d 762, 772-776.) In arguing for admissibility, the Attorney General mistakenly assumes that the threat to commit a violent criminal act is enough to establish admissibility under factor (c). It is not. The evidence must show a criminal act, and threatening words without more do not constitute a criminal act. Accordingly the evidence in question was inadmissible under *Boyd.*

(b) The court also admitted evidence of a "food riot" during which defendant and other inmates threw food from their cells into the hallway to

---

[2] Similarly in reviewing motions to modify a verdict under Penal Code section 190.4, we consider whether the judge who tried the case ruled properly on the motion. We do not discuss how a hypothetical reasonable judge would rule.

protest the allegedly inadequate quantity served. While some inmates threatened the guards, there was no proof that defendant did so, and in any case the utterance of a threat by an inmate in no position to carry out the threat is not a crime (see *Boyd, supra,* 38 Cal.3d at pp. 777-778). The only violence defendant could or did perpetrate was to the food, and violent injury to property is insufficient to justify admissibility. (*Boyd,* 38 Cal.3d at p. 776.)

3. The trial court failed to instruct the jury that Penal Code section 190.3, factor (k) includes as a mitigating consideration not only those matters which extenuate the gravity of the crime, but also any other aspect of the defendant's character or record that he proffers as a basis for a sentence of less than death. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].)

4. The prosecutor erroneously told the jury, contrary to *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-289 [221 Cal.Rptr. 794, 710 P.2d 861] and *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789-790 [230 Cal.Rptr. 667, 726 P.2d 113], that the absence of evidence showing the existence of various statutory mitigating considerations requires the jury to weigh those considerations as aggravating factors in determining penalty.

This is the most egregious case of *Davenport* error we have yet encountered. The prosecutor went down the statutory list, and characterized *every* factor as aggravating. With respect to factor (d)—mental or emotional disturbance—he said, "This defendant . . . has no mental or emotional disturbance other than the fact that he is just a sociopath, and antisocial and likes to hurt people. So in this particular case that's an aggravating factor." With respect to factor (e)—victim participation—he found the absence of such participation made it an aggravating factor. He said the same as to factor (f)—belief in moral justification. For factor (g)—duress—he noted that no one dominated the defendant and compelled him to kill the victim, so "[t]his is an aggravating factor." Defendant presented substantial evidence of factor (h)—mental disease or defect which impairs defendant's capacity to conform to legal requirements—but the prosecutor argued that the evidence did not establish "diminished capacity," and hence "that is a aggravating factor." He characterized defendant's age (factor (i)) as aggravating. He said that factor (j)—whether defendant was an accomplice—was aggravating because defendant acted alone. And in summation he asserted that factor (k)—any other circumstance which extenuates the gravity of the crime—was aggravating even though in *People* v. *Boyd, supra,* 38 Cal.3d 762, 775-776, we explained that factor (k) can only be mitigating.

The majority acknowledge that the prosecutor's argument "seems contrary to *Davenport,*" but state that "we do not consider the prosecutor's

argument to be reversible prosecutorial misconduct, because a timely objection and admonition could have cured any harm." (*Ante,* p. 456.) This statement sloughs over the question whether defense counsel can reasonably be expected to object to such argument in a trial preceding *Davenport, supra,* 41 Cal.3d 247, or *Rodriguez, supra,* 42 Cal.3d 703, and the question whether the trial court would have sustained such an objection. (Since the judge, ruling on the motion to modify the judgment, said that various neutral or mitigating factors were aggravating it is likely that he would have overruled any *Davenport* objection.)

I agree, however, that there was no prosecutorial misconduct. At the time of argument the prosecutor could reasonably believe that he could properly argue the absence of evidence of a mitigating factor rendered the factor aggravating. But the question of misconduct is irrelevant. As we explained in *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031, footnote 15 [245 Cal.Rptr. 185, 750 P.2d 1342], "[o]ur concern is not with the ethics of the prosecutor or the performance of the defense, but with the impact of the erroneous interpretation of the law on the jury." The majority tacitly concede the point, for in this, as in every other case involving *Davenport* error, they do not stop with noting the failure to object, but go on to treat the issue on its merits.

The majority further argue that the jury was instructed to consider the listed factors only "if relevant," and that a reasonable jury "would have understood that it was allowed to give to those factors whatever little weight they deserved." (*Ante,* p. 456.) But the jury does not know what factors the law considers relevant. The vice of *Davenport* error is that it tells *the jury that factors are relevant when in fact they are not, and that factors are aggravating when in fact they are neutral or mitigating.* Of course a jury which followed the prosecutor's advice would still be "allowed" to assign the factors what little weight they deserved. It is also allowed to assign them a great weight which they do not deserve. The one thing it cannot do is the thing it is supposed to do: assign them *no* aggravating weight at all.

5. In his argument to the jury, as in his prior voir dire of the jurors, the prosecutor misinformed the jury concerning the process by which they should determine the penalty, in violation of *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds, *sub nomine, California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].

The prosecutor began his closing argument by reminding the jurors of the voir dire, and said that "we all agreed that if in weighing these factors the aggravating factors outweighed, are heavier than the mitigating factors, the

penalty to be imposed is the death penalty." We must therefore examine the voir dire to find the "agreement" to which the prosecutor referred.

The prosecutor told one prospective juror, who actually served on the jury, that "if you determine that the aggravating factors are just a little bit heavier than the mitigating factors, then the law requires you to return a death penalty verdict." The dialogue continued: Prosecutor: "Do you have any quarrel with that?" Juror: "No." Prosecutor: "And, can you look at yourself and say, 'okay,' . . . I can feel these aggravating factors outweigh the mitigating factors, but I am still kind of on the fence about the death penalty. I am not sure about the death penalty, but in my mind I feel the aggravation outweighs the mitigation. You will comply with the law and return a death penalty verdict?" Juror: "Yes. If that's how I feel. If I feel that one outweighs the other."

The prosecutor's statements were clearly error, because they left the juror in question with the mistaken impression that the jury "was 'required' to return a sentence of death if 'aggravation outweighed mitigation' without, or even despite, each juror's *personal* conclusion from the evidence, about whether a sentence of death was appropriate under the circumstances for the offense and offender." (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1278 [232 Cal.Rptr. 849, 729 P.2d 115], italics in original.) While other aspects of the voir dire of this juror were not necessarily erroneous—she said she would examine the evidence and impose the death penalty only when "necessary," whatever that meant—they did not make it clear that the quoted remarks of the prosecutor were in error, and that it was her duty not to impose the death penalty, regardless of the balance of aggravation and mitigation, unless she believed death to be the appropriate penalty. Thus at least one juror who tried defendant probably did so under an erroneous view of her responsibility. The voir dire of other jurors was not as obviously erroneous, but nonetheless proceeded in much the same vein.[3]

The prosecutor then reviewed the statutory factors, concluding, erroneously, that all were aggravating. Instead of informing the jurors that they

---

[3] The prosecutor did not tell the other jurors that they had a duty to return a death verdict whenever aggravation outweighed mitigation in spite of doubts whether death was appropriate. He did, however, describe the process of determining penalty as an arithmetical process devoid of the moral and normative considerations implicit in any attempt to determine the appropriate penalty. He told one juror, for example, that "You add this up, and if the aggravating evidence outweighs the mitigating evidence, then the judge will instruct you that you have to return the death penalty." He told another: "If the aggravating factors are heavier than the mitigating factors or if the aggravating factors outweigh the—or outnumber the mitigating factors, then the law requires you to vote for the death penalty." To another he said, "[I]f the aggravating factors, the factors that aggravate the defendant's past conduct and this crime here, if that outweighs the mitigating evidence, the law requires that you vote for the death penalty. . . . There are actual factors that the judge will tell you about. And, you can just add those up and weigh them."

should consider these factors in deciding whether death was the appropriate penalty, he told them that the law makes that determination for them: "[T]he law says if you add those factors up and the aggravating outweigh the mitigating, that's a case where the death penalty is the only appropriate penalty."[4]

## III.

These errors do not exist in isolation; instead, each adds to the impact of the others. The prosecution strategy follows a consistent pattern. At voir dire, the prosecutor told the jurors that if aggravating factors outweighed mitigating factors a death verdict was required. With attention thus focused on the relative number of aggravating and mitigating factors, and the evidence presented to support such factors, the prosecutor introduced inadmissible evidence of aggravating factors, and other evidence admissible only under a reasonable-doubt instruction, which was not given.

The prosecutor's closing argument put the package together. He told the jury that five irrelevant factors were aggravating. He told them that two others which could only be mitigating—factors (h) and (k)—were aggravating. He concluded by explaining that all eleven of the factors were aggravating, when in fact there were three aggravating, two mitigating, and the rest irrelevant. Having thus left the jury with a highly exaggerated view of the number of aggravating factors, he reminded them that on voir dire they had agreed to vote for a death verdict if aggravation outweighed mitigation and concluded that the law required them to return a death verdict. In short, the combined effect of the prosecution strategy and the numerous penalty phase mistakes in this case was to leave the jurors with the erroneous impression that, if they were faithfully to perform their legal duty, they must return a death verdict. I conclude that it is reasonably possible that, but for the cited errors, the jury would have returned a more favorable verdict.

## IV.

In addition to the errors during the penalty trial, the court also erred in ruling on the motion to modify the judgment (Pen. Code, § 190.4). Its

---

[4] Inventing a kind of inverse Gresham's Law (Gresham's Law is that bad money drives out good money), the majority assume that correct argument dispels the effect of incorrect argument. Thus when the prosecutor states the law incorrectly, and defense counsel states it correctly, the majority assume without further inquiry that the jury followed the defense version. It is not a matter of roles; doubtless if the prosecutor stated the law correctly and defense counsel misinformed the jury, the majority would be equally willing to assume the jury followed the prosecutor's version.

ruling erroneously stated that the absence of evidence of mitigating factors rendered those factors aggravating, and unconstitutionally limited the scope of mitigating evidence under Penal Code section 190.3, factor (k). The majority opinion acknowledges those errors, but states since it found similar errors did not prejudice the jury's penalty determination, by analogy such errors did not prejudice the judge's ruling. (*Ante,* p. 462.)

The analogy is faulty. In finding the *Davenport* and factor (k) errors nonprejudicial, the majority speculate that the jury may have rejected the prosecutor's mistaken arguments. That reasoning does not apply to our review of the judge's ruling on the motion for modification. We cannot speculate that the judge may have rejected the prosecutor's theory and decided the case according to a correct view of the law; we know, from his written order, that he shared the prosecutor's misconception.

In effect, the majority are saying that even though the judge had a totally skewed view of the case—he thought there were eleven aggravating factors and no mitigating factors, when in fact there were three aggravating and two mitigating—he still would have reached the same result under a correct view of the law. He might have. But to claim that it is not reasonably possible that he would have reached a different result, and on that basis to condemn a man to die, goes further than I am willing to go.

Appellant's petition for a rehearing was denied October 13, 1988. Broussard, J., was of the opinion that the petition should be granted.