Filed 9/18/14  P. v. Atkinson CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN S. ATKINSON,<br><br>    Defendant and Appellant. | 2d Crim. No. B245725<br>(Super. Ct. No. 2010044024)<br>(Ventura County)<br>ORDER MODIFYING OPINION AND<br>DENYING REHEARING<br>(NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed August 20, 2014, be modified as follows:

1.  On page 1, the first paragraph, the second sentence is deleted and the following is inserted in its place:

> On the charges of attempted murder and robbery, the jury also found true the allegation that Appellant used a firearm in violation of sections 12022.5, subdivision (a)(1) and 12022.53, subdivision (b).  On the charges of false imprisonment, the jury found true the allegation that Appellant used a firearm in violation of section 12022.5.

2.  On page 5, the second full paragraph, the third sentence is deleted.

3.  On page 6, the beginning of the first full paragraph, is modified to read:

> The court then gave the jury a special instruction drafted by the court and requested by Appellant that states:

There is no change in the judgment.

Appellant's petition for a rehearing is denied.

Filed 8/20/14 (unmodified version)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN S. ATKINSON,<br><br>    Defendant and Appellant. | 2d Crim. No. B245725<br>(Super. Ct. No. 2010044024)<br>(Ventura County) |

John S. Atkinson appeals the judgment entered after he was convicted by a jury of (1) attempted murder of a peace officer (Pen. Code, §§ 187/664, 190.2, subd. (a))[1]; (2) assault with a deadly weapon upon a peace officer (§ 245, subd. (c)); (3) assault with a stun gun or Taser on peace officer (§ 244.5, subd. (c)); (4) second degree robbery (§ 211); (5) false imprisonment of his parents (§ 368, subd. (f)); and (6) elder abuse of his parents (*id.*, subd. (c)). On the charges of attempted murder and false imprisonment, the jury also found true that Appellant used a firearm in violation of sections 12022.5, subdivision (a)(1) and 12022.53, subdivision (b). Appellant was sentenced to an indeterminate sentence of life imprisonment with the possibility of parole plus determinate consecutive sentences.

---

[1] All statutory references are to the Penal Code.

On appeal, Appellant contends that (1) the court abused its discretion by permitting the prosecutor to argue to the jury that if Appellant suffered from a mental disease, disorder or defect, it was self-induced and should not be considered to determine whether he knew his intended victim was a peace officer when he attempted to murder her; (2) the court erred by refusing to excuse Juror No. 11, who disclosed the mother of a prosecution witness lived in the juror's neighborhood and that the juror met the witness on a few occasions; (3) the trial court abused its discretion in sentencing him by failing to give sufficient consideration to the effect his mental disease, disorder or defect had on his conduct; and (4) that cumulative error requires a new trial. We affirm.

STATEMENT OF FACTS

*The Incident*

Steve and Diane Atkinson, their son John, Appellant, and his sister Jennifer lived on a ranch near Ojai. Appellant's childhood was unremarkable for mental health issues but symptoms began to appear when he was in his mid-teens. By age 20, his irrational behavior had resulted in several arrests and time in jail. Appellant's mental health progressively worsened in spite of his own efforts and the efforts of his parents to treat his problems with psychotherapy and medications.

In 2009, Appellant was sentenced to a year in the Santa Barbara County jail. He was transferred to Patton State Hospital for mental health treatment and remained there as a patient for about 10 months.

In October or November 2010, Appellant returned to his parents' residence. He was unkempt and appeared to his mother to have been homeless for some time. He was not taking psychotropic medications and became progressively more angry and mistrustful. He refused Diane's entreaties to seek help. He insisted he was "not crazy."

On December 9, 2010, Appellant confronted Steve's and Diane's housekeeper and in an angry rage chased her out of the house. The next day, Diane confronted Appellant about intimidating and interfering with the work of the housekeeper. This encounter enraged Appellant and led to a loud, angry exchange.

Diane believed Appellant was having a psychotic break. He began yelling

at her and his father, telling them they were not real but that they were fakes in rubber suits. He overpowered them and ordered them into the kitchen. When Appellant stepped out of the room, Diane dialed 911 on her cellphone but hung up before speaking to the operator.

When the 911 operator returned Diane's hang-up call, Diane answered but hung up before saying anything. Appellant asked his mother if she had called the police and although she denied doing so, Appellant rejected the answer, accused her of calling the police and became even angrier. Appellant took Diane's cellphone from her and destroyed it. He also ripped the landline out of the wall.

The Ventura County Sheriff's Department dispatched Deputy Traci Salmon to the Atkinson property to investigate the 911 hang-up call. Salmon arrived at the property in uniform and was wearing a jacket that had a badge affixed to it. She was wearing body armor and her tool belt held a semiautomatic pistol, pepper spray, a Taser, handcuffs, a radio, keys and a tape recorder. Although Salmon called a partner for assistance, she was unable to reach him. Salmon, concerned that there was a woman in the house who needed help, decided to approach the residence without assistance.

Appellant answered Salmon's knock on the door but blocked her view into the home. Salmon identified herself as a Ventura County deputy sheriff and told Appellant she was responding to a 911 call from the residence. Her uniform jacket and badge were in plain view as was the tool belt. Salmon said Appellant "seemed odd." When Salmon asked Appellant if someone had called 911, he said "No, no one else lives here." Salmon told Appellant that the 911 operator returned the call from the Atkinson house and that a woman answered. She said she could not leave without seeing and talking with the woman. Appellant then admitted that his mother lived there. Salmon told Appellant that she would leave if she could be sure his mother was unhurt.

Appellant then opened the door a little wider and said, "Hey Mom, the deputy here wants to know if you are ok." By this time, Diane and Steve had moved from the kitchen into the living room so they would be seen by Salmon. She heard Steve say, "We need help."

3

Salmon stepped back a few feet and withdrew the Taser from its holster and firmly instructed Appellant to sit down. Appellant charged Salmon from the doorway, grabbed her and they struggled for control of the Taser. Appellant eventually wrested the Taser away from Salmon, pointed it at Salmon's head and fired it.

The fight then turned to control of Salmon's firearm and moved from the porch to inside the residence. Appellant asked Salmon if she had backup and if she was a real deputy sheriff and if her body armor and gun were real. During the struggle for the gun, Appellant straddled Salmon and struck her repeatedly as he tried to dislodge her hand from her gun. Salmon fired three shots at Appellant. The first shot struck him in the front of his shin and passed through his leg. Two other shots missed. He yelled, "You shot me you bitch." Salmon's fourth attempt either misfired or the gun jammed.

Appellant pried the gun loose from Salmon's grip. He then stood over her and, as he did with the Taser, pointed the gun at her face from a distance of only eight or nine inches and pulled the trigger. The gun did not fire but Salmon heard a mechanical sound she associated with a misfire or a jammed bolt. Salmon then kicked Appellant off of her and ran out the back door of the house.

Salmon hid in a shed and used her cellphone to call for help. She was eventually rescued. After a standoff of about an hour, Appellant's parents left the house one by one and then Appellant surrendered. Sheriff's department detectives interviewed Appellant at the hospital. He twice admitted he knew Salmon was a police officer and explained that he resisted her because he wanted her to go away and not to come in the house.

*Trial*

Although there were some discrepancies in the facts related by witnesses, the evidence of what happened on December 10, 2010 was substantially undisputed. The focus of the People's case and Appellant's defense to the charges was directed to the impact of Appellant's undisputed mental illness on whether he intended to kill Salmon and whether he knew or reasonably should have known she was an on-duty peace officer.

4

The mental health issue dominated the trial. It was raised in the "Jury Questionnaire" completed by prospective jurors. During voir dire, both the prosecutor and appellant's counsel made it clear insanity was not an issue in the case and that mental illness is "not a defense"; that a person "can be mentally ill and still be guilty of a crime." Appellant's counsel asked prospective jurors to agree or disagree with the proposition that a "person could be doing one thing but [have] something else going on in his or her mind." Appellant's counsel, perhaps anticipating the issue that Appellant's mental illness was "self-induced," asked prospective jurors about voluntary intoxication as a defense to a crime. All jurors agreed to follow the instructions of the court as to the law.

Twelve witnesses testified. Neither the prosecution nor the defense called any mental health care provider or other qualified expert to discuss the nature of Appellant's mental disorder or to tell the jury how features of his illness, personality or personal history explained or were in some way linked to what he said or did that day. There was no evidence presented during the trial about the psychotropic medications that had been prescribed for Appellant before and after his arrest and whether any of them effectively suppressed any of the symptoms of his disorder.

Thus both sides appear to have assumed that the significance of Appellant's history of mental illness would be demonstrated simply by what was said and done on December 10, 2010. As a result, there was a paucity of evidence from mental health care providers about the characteristics of Appellant's mental illness, whether it influenced what happened that day and whether taking medication would have changed anything.

*Jury Instructions on Attempted Murder and Appellant's Mental Impairment*

The jury instructions given by the court required the People to prove Appellant "took at least one direct but ineffective step towards killing another person" and "intended to kill that person." (CALCRIM No. 600.) As to the special allegation enhancing the penalty for the crime, the court instructed the jury that the People were required to prove that Deputy Traci Salmon "was a peace officer lawfully performing her duties as a peace officer" and that when Appellant "attempted the murder, the defendant

5

knew, or reasonably should have known, that Traci Salmon was a peace officer who was performing her duties." (CALCRIM No. 602.)

The court then gave the jury a special instruction crafted by Appellant that states: "The special allegation of attempting to murder a peace officer cannot be found true if by reason of a *non-self-induced* mental disease, defect or disorder, the defendant was unable actually to know the status of the alleged victim as a peace officer at the time of the offense. If you have a reasonable doubt as to whether the defendant was able actually to know the status of the alleged victim as a peace officer as a result of a *non-self-induced* mental disease, defect, or disorder, you must find this special allegation not true." (CALCRIM No. 602.1).

Finally, the court read to the jury the pattern instruction about "Mental Impairment: Defense to Specific Intent or Mental State." (CALCRIM No. 3428.) In pertinent part the jurors were told: "You have heard evidence that the defendant may have suffered from a mental disease, defect, or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: [¶] Count 1 requires proof that, when the defendant acted, he intended to kill. If the People have not met this burden, you must find the defendant not guilty of Attempted Murder as alleged in count 1. [¶] The special allegation to count 1 requires proof that, when the defendant attempted the murder, the defendant knew, *or reasonably should have known*, that Traci Salmon was a peace officer who was performing her duties." (*Ibid.*, italics added.)

*Closing Arguments of Counsel*

The focus of the prosecutor's argument was what Appellant said and did on December 10, 2010. The prosecutor noted Appellant's admission that he knew Deputy Salmon was a police officer and emphasized Appellant's statements about Salmon's status as a deputy sheriff at the door and during the fight for the Taser and the firearm. The prosecutor pointed to the obvious significance of her uniform, badge and equipment and

6

theorized that Appellant flew into a rage and attempted to kill Salmon because she had no backup and he wanted to avoid yet another contact with law enforcement and jail.

Over Appellant's objection, the court permitted the prosecutor to argue that Appellant "self-induced" his mental illness by choosing not to take psychotropic and anti-depressant medications and by failing to seek help for his symptoms from a health care provider. Respondent's brief concedes the inference suggested by the argument is "weak."

Appellant's counsel countered the argument by emphasizing Appellant's long history of mental illness that was never effectively treated and that progressively worsened. Counsel noted that even eight months of inpatient treatment at Patton State Hospital failed to improve Appellant's perception and mood. She urged the jury to infer from his statements on December 10, 2010 that Appellant did not believe he was confronted by real persons and did not believe that either Salmon or her weapons and equipment were real. She also argued Appellant did not pull the trigger on Salmon's gun and that he did not intend to kill anyone that day.

DISCUSSION

*Prosecutorial Misconduct During Argument*

Appellant claims the court abused its discretion by permitting the prosecutor to argue that the special allegation should be found to be true even if Appellant did not know Salmon was a deputy sheriff because the mental illness that made that so was "self-induced." We disagree.

The prosecutor's argument was inspired by Appellant's pinpoint instruction that Appellant's counsel derived from a footnote in *People v. Rodriguez* (1986) 42 Cal.3d 730 (*Rodriguez*). There, a jury convicted the defendant of the murders of two highway patrol officers during an alcohol and cocaine fueled crime spree. On appeal, the defendant contended he could not constitutionally be found eligible for the death penalty because he "reasonably should have known" that the victim of his intentional killing was an on-duty peace officer. Instead, he said, only those who *actually know* the victim is an on-duty peace officer can be subjected to the penalty. (*Ibid.*) The Supreme Court

7

approved the application of the death penalty to persons who "should have known" but for their ingestion of drugs and alcohol.

In footnote 18 of its opinion in *Rodriguez*, the Supreme Court observed that, although it had no application in the case before it, it might be proper for the court to instruct a jury that a defendant who has a *non-self-induced diminished capacity* "may not be found guilty of the special circumstance at issue here (even if he reasonably should have known his victim was a peace officer engaged in the performance of his duty) if, by reason of *non-self-induced* 'diminished capacity,' defendant was *unable actually to know* the status of his victim." (*Rodriguez*, *supra*, 42 Cal.3d at pp. 781-782; see also *People v. Brown* (1988) 46 Cal.3d 432, 445, fn. 7.)

Footnote 18 is dicta and the note is not authority for the point attributed to it by Appellant. (*Rodriguez*, *supra*, 46 Cal.3d at p. 782.) *Rodriguez* does not address "self-induced mental illnesses." Footnote 18 speaks only to the application of an enhanced penalty for a person who created his or her *diminished capacity*. The case and the footnote say nothing about applying an enhanced penalty to a mentally-ill person who elects not to take medication that would, or could, reduce symptoms that sometimes include violent behavior.

Appellant's pinpoint special instruction was flawed by the way Appellant chose to phrase it. The instruction reads: "The special allegation of attempting to murder a peace officer cannot be found true if by reason of a *non-self-induced* mental disease, defect or disorder, the defendant was unable actually to know the status of the alleged victim as a peace officer at the time of the offense." (CALCRIM No. 602.1.) It plainly invites jurors to find the special allegation to be true *even if* Appellant was "*unable actually to know* the status of the alleged victim as a peace officer" if they believe his mental illness was "self-induced" by, for example, failing to take the medications prescribed for him at Patton State Hospital.

In any event, when a claim of prosecutorial misconduct focuses on the prosecutor's questions or comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an

8

objectionable fashion.' [Citations.]" (*People v. Cole* ( 2004) 33 Cal.4th 1158, 1202-1203.) Nevertheless, prosecutors "have wide latitude to discuss and draw inferences from the evidence at trial[,] [and] [w]hether the inferences the prosecutor draws are reasonable is for the jury to decide. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522; *People v. Cole*, *supra*, at p. 1233.)

CALCRIM No. 3428 accurately states the law on how the jury is to consider evidence of a mental disease, defect or disorder. The jury also received CALCRIM No. 200, which informed the jurors to follow the instructions and disregard any comments by counsel that conflicted with those instructions. We presume the jurors understood and followed these instructions and reached their verdict based upon the strong evidence that Appellant intended to kill Salmon and that he knew she was an on-duty peace officer at the time. (*People v. Boyette* (2002) 29 Cal.4th 381, 436; see also *People v. Najera* (2006) 138 Cal.App.4th 212, 224 [where there is any conflict between counsel's argument and the court's instructions, courts presume the jury followed the instructions]; *People v. Morales* (2001) 25 Cal.4th 34, 47 ["we presume that the jury relied on the instructions, not the arguments, in convicting defendant"].) Given the overwhelming prosecution evidence on the offense, there is no reasonable probability of a different result had the prosecutor not made the remarks. (*People v. Carter* (2005) 36 Cal.4th 1215, 1264.)

*Claimed Failure to Excuse Juror No. 11*

Deputy Sheriff Gunnar Dike was on a list of potential witnesses attached to a juror questionnaire. Juror No. 11 said she knew no one on the list. During the trial, Juror No. 11 heard a reference to Deputy Dike and notified the court that she recognized that name. Juror No. 11 was interviewed by the court and revealed Deputy Dike's mother lived in her neighborhood and that she had spoken to him a couple of times, but not at all in the past year or more. Juror No. 11 said she never socialized with Deputy Dike and was uncertain whether she would even recognize him if he appeared in court to testify. Juror No. 11 assured the court that she could be fair and impartial in her evaluation of the evidence.

9

When a defendant moves for a new trial based on jury misconduct, the trial court must determine whether admissible evidence establishes misconduct, and whether the misconduct, if any, was prejudicial. (*People v. Sanchez* (1998) 62 Cal.App.4th 460, 475; *People v. Duran* (1996) 50 Cal.App.4th 103, 112-113.) Reversal is not required unless the reviewing court concludes there is a substantial likelihood a juror was improperly influenced by being acquainted with a witness. (*People v. Duran*, *supra*, at pp. 112-113.) Unintentional or inadvertent failure to disclose information does not create a presumption of prejudice. The proper test is whether the juror had "a state of mind that 'would prevent a person from acting impartially . . . .'" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 646.)

Substantial evidence supports the trial court's finding that Juror No. 11 did not intentionally fail to disclose either her contacts with Deputy Dike or that she was acquainted with his mother. The court's denial of Appellant's motion for a mistrial was also proper.

*Sentencing Error*

Appellant argues that he should have been permitted to serve consecutive sentences for assaulting Salmon and abusing his parents concurrently with the life sentence for attempting to murder Deputy Salmon. He contends the court failed "to adequately consider the 'essential circumstances' of his psychotic break at the time of the crimes and the long-standing mental illness [that] prevented him from comprehending that he needed help."

First, Appellant's counsel chose to present only scant evidence of the nature of Appellant's mental illness and how it impacted the crimes committed against Salmon and Appellant's parents. And the jury rejected Appellant's mental disease defense in its entirety. The probation report spoke of three circumstances in aggravation: (1) the violence and cruelty of Appellant's acts; (2) his history of violent conduct; and (3) his numerous prior convictions.

The trial court's sentencing decision is reviewed for an abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) A single factor may support a sentencing

10

choice.  (*People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413.)  The court need not weigh aggravating and mitigating factors, nor state a reason for rejecting a mitigating factor.  (*People v. Sandoval*, *supra*, at p. 847.)  On appeal, we do not weigh the aggravating and mitigating factors.  (*People v. Delgado* (2013) 214 Cal.App.4th 914, 919.)  The trial court did not abuse its discretion here when it imposed mid-terms and ordered them to be served consecutively.

*Cumulative Error*

Appellant argues that the cumulative effect of errors combined to deprive him of a fair trial.  Because we reject each of appellant's assignment of errors, his claim necessarily fails.  (*People v. Avila* (2006) 38 Cal.4th 491, 608.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.



BURKE, J.[*]

We concur:


YEGAN, Acting P. J.


PERREN, J.

---

(Judge of the Superior Court of San Luis Obispo County, assigned by the Chief Justice pursuant to art. 6, § 6 of the Cal. Const.)

11

Kevin C. DeNoce, Judge

Superior Court County of Ventura
_____


Marleigh A. Kopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.